T.C. Memo. 1996-14

UNITED STATES TAX COURT

THOMAS E. AND JOAN A. BENNETT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

THEODORE H. AND MARILYN F. BLACK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 31758-85, 36202-86.    Filed January 22, 1996.

<u>Elliot I. Miller</u>, for petitioners.

<u>Maureen T. O'Brien</u> and <u>Paul T. Colleran</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These consolidated cases were assigned to
Special Trial Judge Norman H. Wolfe pursuant to the provisions of

section 7443A(b)(4) and Rules 180, 181, and 183.[1]  They were tried and briefed separately but consolidated for purposes of opinion.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  These cases are part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The underlying transaction in these cases is substantially identical to the transaction considered in the Provizer case.

In a notice of deficiency, respondent determined deficiencies in the 1978, 1979, and 1981 joint Federal income taxes of petitioners Bennett in the respective amounts of $19,120, $954, and $37,715.[2]  Respondent also determined that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section

---

[1]  All section references are to the Internal Revenue Code, in effect for the years in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  The deficiencies in the Bennett case, docket No. 31758-85, for taxable years 1978 and 1979 result from disallowance of investment tax credit carrybacks and business energy credit carrybacks from taxable year 1981.

6621(c).[3]  In an amendment to answer, respondent asserted the following:  For taxable years 1978 and 1979, additions to tax for negligence under section 6653(a); for taxable years 1978, 1979, and 1981, additions to tax for valuation overstatement under section 6659; and for taxable year 1981, additions to tax under section 6653(a)(1) for negligence and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on the underpayment attributable to negligence.[4]

In a notice of deficiency, respondent determined a deficiency with respect to the joint Federal income tax return filed by petitioners Black for 1981 in the amount of $74,111. Respondent also determined additions to tax in the amount of $7,411 under section 6661, in the amount of $3,705 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on the underpayment attributable to negligence.  In an answer to

---

[3]    The notice of deficiency refers to sec. 6621(d).  This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744 and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400.  The repeal does not affect the instant case.  For simplicity, we will refer to this section as sec. 6621(c).  The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

[4]    Corresponding dollar figures were not set out by respondent for these asserted additions to tax.

petition, respondent asserted that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). See supra note 3. In an amendment to answer, respondent asserted an addition to tax under section 6659 for taxable year 1981. See supra note 4.

Petitioners each filed a Stipulation of Settled Issues relating to their participation in the "Plastics Recycling Program" and the additions to tax relating thereto. The parties stipulated that petitioners Bennett and Black are not entitled to any deductions, losses, investment tax credits, business energy credits, or any other tax benefits claimed on their tax returns as a result of their participation in the "Plastics Recycling Program". The parties further stipulated that the underpayments in income tax attributable to petitioners' participation in the "Plastics Recycling Program" are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under section 6621(c).

Respondent and petitioners Bennett also filed a stipulation of settled issues with respect to tax benefits claimed in 1981 flowing from their interests in three other limited partnerships not at issue herein: Ludlow Oil & Gas Drilling Program 1980, Monroe Oil & Gas Drilling Program 1980 Ltd., and Riefenberger No. 1 1981 Ltd.

Respondent's determination of an addition to tax under section 6661 with respect to petitioners Black was not specifically addressed in the stipulation of settled issues nor elsewhere in the record. However, the third stipulation in the stipulation of settled issues provides:

> This stipulation [of settled issues] resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of I.R.C. §6653(a).

Because of this stipulation, we consider any issue with respect to the addition to tax under section 6661 to be settled.

The issues for decision in these consolidated cases are: (1) Whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a); and (2) whether petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable to valuation overstatement.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Petitioners Bennett resided in Avon, Connecticut, when their petition was filed. Petitioners Black resided in New Canaan, Connecticut, when their petition was filed.

During 1981, Thomas E. Bennett (Bennett) was a vice president at Ingersoll-Rand Company (Ingersoll-Rand). His spouse, Joan A. Bennett, was not employed outside the home. Theodore H. Black (Black) was also a vice president of Ingersoll-Rand during 1981. His wife, Marilyn F. Black, was not employed outside the home.

For their respective investments of $25,000, petitioners Bennett and Black each acquired a 2.605-percent interest in the limited partnership Empire Associates (Empire) during 1981. As a result of the passthrough from Empire, on their respective 1981 Federal income tax returns petitioners each deducted an operating loss in the amount of $20,510 and claimed investment tax credits in the amount of $42,402. Petitioners Bennett used $22,328 of the claimed credits on their 1981 return and carried back the unused portion of the credits to 1978 and 1979 in the respective amounts of $19,120 and $954. Respondent disallowed petitioners' claimed deductions and credits related to Empire. In docket No. 31758-85, respondent disallowed petitioners Bennett's claimed deductions related to three previously mentioned partnerships not at issue herein.

The facts of the underlying transaction in these cases are substantially identical to those in Provizer v. Commissioner, T.C. Memo. 1992-177, and may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold seven Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for

$6,867,000 ($981,000 each), of which $533,000 was paid in cash. ECI Corp., in turn, resold the recyclers to F & G Corp. for $8,138,667 ($1,162,666 each), of which $618,000 was paid in cash. F & G Corp. then leased the recyclers to Empire, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were accomplished simultaneously. We refer to these transactions collectively as the Empire transaction.

In Provizer v. Commissioner, supra, we examined the Clearwater transaction. In the Clearwater transaction, PI sold six EPE recyclers to ECI Corp. for $981,000 each, and ECI, in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G leased the recyclers to a limited partnership, Clearwater, which licensed them to FMEC, which sublicensed them to PI. The transaction involved herein differs in two respects: (1) Seven Sentinel EPE recyclers were sold and leased rather than six; and (2) Empire, rather than Clearwater, leased the recyclers from F & G and then licensed them to FMEC. Empire is therefore like Clearwater, occupying the same link in the transactional chain. The Sentinel EPE recyclers considered in these cases are the same type of machines considered in the Provizer case. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Bennett and Black each learned of the Empire transaction from Edward Gallagher (Gallagher). Gallagher was an officer in the personal financial planning department at Bankers Trust. Ingersoll-Rand had retained Bankers Trust in the early 1970's to provide financial counseling to its officers. Gallagher became responsible for the Ingersoll-Rand account starting in the late 1970's and counseled executives on investment planning, estate planning, income tax planning, and retirement planning. Gallagher had been with Bankers Trust since 1964. Before then he had earned a B.A. degree from Holy Cross College in 1962, spent a year in medical school, and served in the U.S. Army.

Gallagher learned of the Empire transaction from Robert Miller (Miller), a lawyer at the firm of Windels, Marx, Davies & Ives (WMDI). Ingersoll-Rand was a client of WMDI. Miller referred Gallagher to John Taggart (Taggart), the head of the tax department at WMDI. Gallagher discussed the transaction with Taggart and the general partner of Empire, Richard Roberts (Roberts). Gallagher read the offering memorandum and used that information to analyze the economics of the investment. Gus Kreischer (Kreischer), who was in charge of the tax section of

the trust department at Bankers Trust, reviewed WMDI's tax opinion letter contained in the offering memorandum and reported favorably to Gallagher with respect to the opinion.

Gallagher discussed the Sentinel EPE recycler transactions with about 11 executives at Ingersoll-Rand. At the behest of Bennett, Gallagher toured PI's Hyannis plant. Upon his return from Hyannis, Gallagher reported to the officers at Ingersoll-Rand and told them that PI was a going concern, that he had seen the recyclers, and that they were big machines. Gallagher also submitted a brief handwritten summary to the same effect. He prefaced his written summary by noting that he did "not have an engineering background." The summary included a list of six purported current end-users of recyclers and contained the following postscript: "If you have any questions or would like an opportunity to see the equipment in operation, please let me know." Gallagher made no representations about the uniqueness of the recyclers.

Neither Gallagher nor Bankers Trust received a commission from Ingersoll-Rand for the investments in the Plastics Recycling transactions. However, Gallagher did receive what he admitted was a "special deal." The typical Plastics Recycling investment entailed the acquisition of an interest in a partnership which leased the recyclers. Such an interest sold for a minimum of $50,000. In December of 1981, however, Gallagher was allowed to purchase a 10-percent undivided interest directly in a recycler,

for which he paid approximately $10,000 in cash and $90,000 in notes. Gallagher told representatives of Bankers Trust and also Bennett and probably Black that he was receiving this special deal.

Bennett is a graduate of the New York State Maritime Academy, from which he received a degree in marine engineering in 1950. After graduation he tested for a Coast Guard license and was qualified to operate any ship as a third assistant engineer. Bennett began working for Ingersoll-Rand in the fall of 1951. Bennett started as an applications engineer in the centrifugal pump marketing department where he was responsible for working on worldwide customer inquiries, and was a specialist on power plants and marine and navy equipment. From 1951 to 1968 he served in a marketing capacity and continuously dealt with product pricing. During 1972 he completed an advanced management program at Harvard University. By 1978 he had been promoted to vice president in charge of strategic planning, and became involved in the planning for all of the businesses and also mergers and acquisition analysis and studies. In mid-1981 he was reassigned to the Torrington Company, an Ingersoll-Rand subsidiary located in Torrington, Connecticut, which manufactured roller bearings.

As an officer of Ingersoll-Rand, Bennett received financial counseling from Bankers Trust. The Bankers Trust representative during 1981, Gallagher, told him about Empire. Bennett reviewed

the Empire offering memorandum and discussed the investment with Gallagher and with other Ingersoll-Rand executives. Bennett insisted that Gallagher visit the PI plant and see the recyclers. Gallagher did so and reported back to the executives. Bennett knew Gallagher was not an engineer and "could not assess the machine in terms of its technical capability." Gallagher arranged for the general partner of Empire, Roberts, to meet with the officers at the Ingersoll-Rand corporate headquarters. Bennett did not attend that meeting.

Ingersoll-Rand manufactures machinery, including construction equipment, pumps, air compressors, rock drills, pneumatic tools, and bearings. Its 1993 revenues were slightly more than $4 billion. One of Ingersoll-Rand's subsidiaries during 1981, Improved Machinery Company (IMCO), manufactured plastic injection molding equipment. Bennett was aware of IMCO and the nature of its business in 1981. He had been to the IMCO plant several times and knew that IMCO's injection molding machine used pellets, probably the same type produced by the Sentinel EPE recycler. Bennett did not, however, talk to anyone at IMCO about the Empire transaction or the Sentinel EPE recycler prior to making his investment in Empire. Bennett knew that several recyclers purportedly had been placed with end-users before he invested in Empire. However, Bennett did not see a Sentinel EPE recycler prior to investing in Empire, nor did he

investigate whether there were any existing or potential competitors for the Sentinel EPE recycler.

Black joined the U.S. Marine Corps. at the end of 1945. In 1949 he entered the U.S. Naval Academy, and in 1953 he graduated with a bachelor of science degree in electrical engineering. Black began his career at Ingersoll-Rand in 1957. Over the course of his career, Black held the positions of salesman, technical personnel director, account manager, general manager, district manager, president, and chairman and chief executive officer. As general manager of the turbo products division in 1967, he first became responsible for pricing specially engineered equipment with unique proprietary technology. In the fall of 1974, Black attended an advanced management program at Harvard University.

Black first heard of the Sentinel EPE recyclers from Gallagher in 1981. He had no formal education, training, or background in chemical engineering, plastics engineering, or plastics processing, although he had substantial knowledge of some plastics processing from the standpoint of the seller of machinery. His investigation of the Empire transaction did not extend beyond discussions with Gallagher and a review of the offering memorandum. Black did not see a Sentinel EPE recycler prior to investing in Empire, did not speak to anyone at IMCO, and never did a personal investigation of the competition.

OPINION

In <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, a test case involving the Clearwater transaction, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the <u>Provizer</u> opinion, they have stipulated that their investment in the Sentinel EPE recyclers was similar to the investment described in <u>Provizer v. Commissioner</u>, <u>supra</u>. The underlying transaction in these cases (the Empire transaction) is in all material respects identical to the transaction considered in the <u>Provizer</u> case. The Sentinel EPE recyclers considered in these cases are the same type of machines considered in the <u>Provizer</u> case.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and

petitioners' testimony, we hold that the Empire transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiency. We note that petitioners have explicitly conceded this issue in stipulations of settled issues filed shortly before trial. The record plainly supports respondent's determination regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

## Issue 1. Sec. 6653(a) Negligence

In the notice of deficiency in docket No. 36202-86, respondent determined that petitioners Black were liable for the negligence additions to tax under section 6653(a)(1) and (2) for 1981. Petitioners Black have the burden of proving that respondent's determination is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). In an amendment to answer, respondent asserted that petitioners Bennett were liable for the negligence additions to tax under section 6653(a)(1) and (2) for 1981, and under section 6653(a) for 1978 and 1979. Because these additions to tax were raised for the first time in respondent's amendment to answer, respondent bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994).

Section 6653(a) for 1978 and 1979 and section 6653(a)(1) for taxable year 1981 provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for taxable year 1981 provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).

Petitioners each contend that they were reasonable in claiming deductions and investment credits with respect to their investment in Empire. To support this contention, petitioners each allege, in general terms, the following: (1) That claiming the deductions and credits with respect to Empire was reasonable in light of a so-called oil crisis in the United Sates in 1981, and (2) that in claiming the deductions and credits, petitioners reasonably relied upon Gallagher and the offering materials.

Petitioners argue, in general terms, that they were reasonable in claiming the deductions and credits related to

Empire because of rising oil prices in the United States in 1981. Petitioners placed into the record several documents from the period 1979 to 1981, including speeches by William L. Wearly (Wearly), chairman of the board of Ingersoll-Rand; articles from Modern Plastics magazine; and an energy projections report from the U.S. Department of Energy (DOE). Wearly's speeches, given at colleges and universities, discussed business and national policy challenges. One of his concerns was U.S. dependency on foreign oil. The Modern Plastics articles and DOE report speculated on the price of oil, among other things. Petitioners failed to explain, however, the connection between these speculative materials and the Empire investment. We find petitioners' vague, general claims concerning the so-called oil crisis to be without merit.

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992) (citing Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir., 1988), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinctly different from the facts of these cases. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion notes that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that

the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Id. at 177. In the present cases, however, one of respondent's experts, Steven Grossman, noted that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic

engineer to review the offering materials. Id. at 166. In the present cases, Black testified that he has no formal background or education in plastics engineering or plastics processing, although he is knowledgeable about polyethylene "for the purposes of selling machinery", and nothing in the records indicates that Bennett had any experience or knowledge in plastics or plastics recycling. Moreover, although they had the personal ability to do so and the resources to have it done, petitioners did not independently investigate the Sentinel EPE recyclers. They did not hire an expert in plastics to evaluate the Empire transaction either. We consider petitioners' arguments with respect to the Krause case inapplicable.

Petitioners' reliance on Rousseau v. United States, 91-1 USTC par. 50252 (E.D. La. 1991), is similarly misplaced. In Rousseau, the property underlying the investment, ethanol producing equipment, was widely considered at that time to be a viable fuel alternative to oil and its potential for profit was apparent. In addition, the taxpayer therein conducted an independent investigation of the investment and researched the market for the sale of ethanol in the United States. In contrast, as we noted in distinguishing the Krause case, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in the polyethylene recyclers here in question. See supra pp. 16-17. Petitioners did not independently investigate the Sentinel

EPE recyclers or hire an expert in plastics to evaluate the Empire transaction. This inattention to the machinery involved in the transaction is particularly telling since petitioners each had experience in pricing and selling machinery and ready access to IMCO, an Ingersoll-Rand subsidiary involved in plastics and which Bennett believed used pellets like those produced by the Sentinel EPE recycler. The facts of petitioners' cases are distinctly different from the Rousseau case. Accordingly, we do not find petitioners' arguments with respect to the Rousseau case applicable.

In each of the cases before us, petitioners' investigation of the Empire transaction and the Sentinel EPE recyclers was limited to conversations with Gallagher and other Ingersoll-Rand executives and examination of the Empire offering materials. Nonetheless, petitioners argue that their reliance on Gallagher and the representations in the offering materials insulate them from the negligence additions to tax.

Under some circumstances a taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer

from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure.  Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974).

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988).  We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture.  Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447.

The record here shows that petitioners' "adviser" in this matter, Gallagher, possessed no special qualifications or professional skills in the recycling or plastics industries.  Gallagher testified that Bankers Trust's due diligence involved

only a review of the tax opinion letter.  He explained that he relied upon the people at Ingersoll-Rand to make their own judgments of the value of the machines involved in the Empire transaction since many of them were engineers and many had their own resources to ascertain the value of machinery.  Gallagher testified that the taxpayers he advised at Ingersoll-Rand concerning the Empire transaction "absolutely" understood that they were not to rely upon him as to the value of the machinery.  While he purportedly read the offering memorandum, Gallagher could not recall at trial how the Empire transaction was structured, how Empire was to receive income, or how much its monthly lease payments were.  Gallagher could not even recall the name of the purported end-user of the recycler in which he personally had invested.

Gallagher spoke with Taggart and Roberts, but the record does not indicate what representations they may have made to him or if he learned anything beyond the representations in the offering memorandum.  Gallagher visited PI at the behest of Bennett.  His observations were those of a layman, and he was careful to caution that he was not an engineer.  As Bennett put it, Gallagher "could not assess the [Sentinel EPE recycler] machine in terms of its technical capability," but he could verify the existence of the machines.

In our view, petitioners' reliance on Gallagher was not reasonable.  It was petitioners' reliance upon the purported

values of the Sentinel EPE recyclers that generated the deductions and credits in these cases. Yet the purported value of the Sentinel EPE recyclers is the very thing that petitioners and Gallagher did not verify. A taxpayer may rely upon his adviser's expertise (in these cases financial planning and tax advice), but it is not reasonable or prudent to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts which he does not verify. See Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329.

In fact, both Black and Bennett plainly were more capable of assessing the economic value of the recyclers than Gallagher because of their experience pricing machinery at Ingersoll-Rand. Petitioners also had ready access to the IMCO subsidiary of Ingersoll-Rand, which was involved in plastics and possibly used the same type of pellets produced by the Sentinel EPE recycler. Petitioners had a list of supposed end-users of the recycler and an open invitation from Gallagher to arrange for a tour to see the equipment in operation. Even though petitioners could have independently investigated the recyclers, they did nothing more than have Gallagher verify the existence of the recyclers. Petitioners expected no more from Gallagher, for as Bennett testified, he could not assess the machines from a technical

standpoint.  Petitioners are not insulated from the negligence additions to tax by claiming reliance on Gallagher.

Petitioners also contend that they read and reasonably relied upon the Empire offering memorandum and the reports of the evaluators annexed thereto.  However, a careful consideration of the materials in the Empire offering memorandum, especially the discussions in the prospectus of high writeoffs and risk of audit, would have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217.  The preface to the memorandum contained the following:  NO OFFEREE SHOULD CONSIDER THE CONTENTS OF THIS MEMORANDUM *** AS *** EXPERT ADVICE. *** EACH OFFEREE SHOULD CONSULT HIS OWN PROFESSIONAL ADVISERS AS TO LEGAL, TAX, ACCOUNTING AND OTHER MATTERS RELATING TO ANY PURCHASE BY HIM OF UNITS.  It also clearly stated that the Empire transaction involved significant tax risks and that in all likelihood the Internal Revenue Service would challenge the transaction.  In a "business risks" section, it warned that there was no history for the partnership and no established market for the recyclers or the pellets.

At trial, Bennett could not recall having read those business risk warnings or the statements that there was no market for the recyclers or for the pellets of recycled plastic.  Black could not recall having read that there was no market for the

pellets or the recycler. Bennett testified that he was motivated by the report of Stanley M. Ulanoff (Ulanoff), a marketer, which was attached to the offering circular, even though Ulanoff had not done a marketing analysis or put a value on the machine. He also testified that in his experience, the price of machinery is generally predicated upon the performance aspects rather than the production cost. However, such an analysis was not done by Ulanoff. Black testified that he "relied on others" regarding the evaluation of the recycler, but that it was "in hindsight, not very brilliant on [his] part" to have done so. It is questionable from the records in these cases how closely petitioners read the offering memorandum and to what extent they relied on the representations therein. However, even if petitioners did thoroughly review the offering memorandum, such reading does not relieve them of negligence.

On its face, the Empire transaction should have raised serious questions in the minds of ordinarily prudent investors. According to the offering memorandum, the projected benefits for each $50,000 investor were investment tax credits in 1981 of $86,328 plus deductions in 1981 of $39,399. In the first year of the investment alone, petitioners each claimed an operating loss in the amount of $20,510 and investment tax and business energy credits related to Empire totaling $42,402, while petitioners

each invested only $25,000 in Empire.[5]  The direct reductions in petitioners' respective Federal income taxes, from just the tax credits, equaled 170 percent of their cash investment. Therefore, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the [Empire] deal."  Indeed, Gallagher testified that he probably told petitioners that they would never be out of pocket on their Empire investment.  A reasonably prudent person would not conclude without substantial investigation that the Government was providing significant tax benefits to taxpayers in these circumstances.  McCrary v. Commissioner, 92 T.C. 827, 850 (1989).

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.  Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler having a value of $1,162,666.  In support of this position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates.  Carmagnola had been retained by the Internal Revenue Service in 1984 to evaluate

---

[5]    Petitioners Bennett used $22,328 of the claimed credits on their 1981 return and carried back the unused portion of the credits to 1978 and 1979 in the respective amounts of $19,120 and $954.

the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners."  Based on limited information available to him at that time, Carmagnola preliminarily estimated the value of the Sentinel EPE recycler to be $250,000.  However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by petitioners.  The projected valuations therein were based on inadequate information,[6] research, and investigation, and were subsequently rejected and discredited by their author. Respondent likewise rejected the reports and considered them unsatisfactory for any purpose; and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency.  Even so, petitioners' counsel obtained copies of these reports and urge that they support the reasonableness of the values reported on their returns.  Not surprisingly, petitioners did not call

---

[6]     In one preliminary report, Carmagnola states that he has "a serious concern of actual profit-level" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Carmagnola to testify in these cases,[7] but preferred instead to rely solely upon his preliminary, ill-founded valuation estimates. The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court of Appeals in the Provizer case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence. Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners' reliance on Mollen v. United States, 72 AFTR2d 93-6443, 93-2 USTC par. 50585 (D. Ariz. 1993) is misplaced. The taxpayer in Mollen was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education ("CME") accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership which invested in the production, marketing, and distribution of medical educational video tapes. The taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable. Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer

---

[7] Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.

regarding those matters.  Moreover, as the District Court noted, the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable."

The records in these cases, on the other hand, show no comparable evidence that either of petitioners or their "adviser," Gallagher, had formal education, expertise, or experience in plastics or plastics recycling, although Black explained that he had substantial knowledge of polyethylene for purposes of selling machinery.  As a representative of Bankers Trust, Gallagher's due diligence responsibilities extended only to a review of the tax opinion letter.  He took no responsibility for the valuation of the machinery in the Empire transaction. Petitioners had knowledge and experience in business and the pricing of machinery, and ready access to IMCO, a subsidiary of Ingersoll-Rand which manufactured plastic injection molding equipment, and which Bennett believed used the same type of pellets produced by the Sentinel EPE recycler.  However, they did not utilize that knowledge and experience or consult anyone at IMCO with respect to the purported value of the Sentinel EPE recycler or its economic viability.  The facts of these cases are distinctly different from those in the Mollen case.  We find petitioners' arguments with respect to the Mollen case inapplicable.

Petitioners' arguments are not supported by Anderson v. Commissioner, 62 F.3d 1266 (10th Cir. 1995), affg. T.C. Memo.

1993-607, where the taxpayers were found liable for negligence additions to tax. In <u>Anderson</u>, the taxpayers claimed tax benefits based upon their acquisition of property listed at $124,500, but for which they actually paid $6,225 in a cash downpayment (5 percent of the purchase price) plus a 5-year financing arrangement. Had the acquisition been nothing more than a $6,225 passive investment, noted the Court of Appeals, it would have been reasonable for the taxpayers to rely on the advice of a good friend who had thoroughly investigated the investment.[8] However, because the transaction was structured and represented as a purchase in the amount of $124,500, the Court of Appeals held that something more was required.

In the cases before us, petitioners claimed tax benefits based on the assumption that they leased, through Empire, an interest in $8,138,662 worth of recycling machines. Based on their investments of $25,000 each, Black and Bennett each claimed a qualified investment in new investment credit property with a basis of $212,012, with resulting first-year tax credits of $42,402 and deductible losses of $20,510, a substantial transaction clearly requiring careful investigation under the <u>Anderson</u> case. Petitioners' adviser, Gallagher, reviewed the

---

[8]    The adviser had his accountant and attorney review and check out the structure of the investment; he spoke with the investment principal; he looked into the principal's background and checked out his references, banks, other business connections, and the Better Business Bureau; and he spoke with competitors to make sure the venture was viable.

offering memorandum, had conversations with Taggart and Roberts, and visited the PI plant.  Unlike the adviser in <u>Anderson</u>, he did not thoroughly investigate or educate himself in the industry being invested in.  In fact, Gallagher made it clear at the trial that Bankers Trust's due diligence responsibilities regarding Empire were limited to a review of the tax opinion letter.  In view of the $212,012 claimed basis for the interest of each petitioner in the machinery, from which the investment credits stemmed, a substantial amount and more than eight times greater than the cash invested, plainly something more was required.  Accordingly, we find petitioners' reliance on the <u>Anderson</u> case inapplicable.

Under the circumstances of these cases, petitioners Bennett and Black failed to exercise due care in claiming the large deductions and tax credits with respect to Empire on their respective Federal income tax returns.  We hold that petitioners did not reasonably rely upon Gallagher and the offering memorandum, or in good faith investigate the underlying viability, financial structure, and economics of the Empire transaction.  In fact, the records indicate that petitioners were more influenced by the fact that their fellow executives at Ingersoll-Rand were investing in Sentinel EPE recycler partnerships than by anything they learned from Gallagher or the offering memorandum.  Black testified that he "was very impressed by the fact that some of our supposed financial geniuses at

Ingersoll-Rand \*\*\* all invested in this," while Bennett testified that he was "very much influenced" by the actions of his fellow executives and that the investment by people he respected "made a considerable impact" on him.  However, in our view the record in these cases, including the testimony of Black and Bennett and their manner in presenting that testimony, establishes that they are men of education, experience, and talent in the business of manufacturing and selling machinery, that during the time in issue they were senior executives of a large machinery manufacturing company, that they were highly knowledgeable about appropriate pricing for a great variety of machinery, that they had the ability and resources to learn the value of the machinery involved in the Empire plastics recycling venture, in which they invested, and that they could have obtained such information without undue expense or effort.

Upon consideration of the entire records, we hold that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a)(1) and (2) for 1981. Respondent is sustained on this issue.

Issue 2.  Sec. 6659 Valuation Overstatement

In amendments to the answers, respondent asserted additions to tax with respect to petitioners in these cases under section 6659 for valuation overstatement.  Because these additions were raised for the first time in amendments to the answers,

respondent bears the burden of proof on these issues.  Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994).

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement.  Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c).  If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment.  Sec. 6659(b).

Petitioners claimed tax benefits, including investment tax credits, based on purported values of $1,162,666 for each Sentinel EPE recycler.  Petitioners each concede that during 1981 the fair market value of a Sentinel EPE recycler was not in excess of $50,000.  Therefore, if disallowance of petitioners' claimed tax benefits is attributable to the valuation overstatement, petitioners are liable for the section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the tax benefits claimed with respect to Empire.

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements.  See McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent

taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. Krause v. Commissioner, 99 T.C. 132, 179 (1992) (citing Todd v. Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1989-684 (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement); Masters v. Commissioner, T.C. Memo. 1994-197; Harness v. Commissioner, T.C. Memo. 1991-321.

In the respective stipulations of settled issues, petitioners conceded that they "are not entitled to any deductions, losses, investment credits, business energy investment credits, or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program." In Todd v. Commissioner, supra, and McCrary v. Commissioner, supra, we denied application of section 6659, even though the subject property was overvalued, because the related deductions and credits had been conceded or denied in their entirety on other grounds. In Todd, we found that an

underpayment was not attributable to a valuation overstatement because property was not placed in service during the years in issue. In McCrary, we found the taxpayers were not liable for the section 6659 addition to tax when, prior to the trial of the case, the taxpayers conceded that they were not entitled to the investment tax credit because the agreement in question was a license and not a lease. In both cases the underpayment was attributable to something other than a valuation overstatement.

This Court has held that concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, what is significant is the ground upon which the investment tax credit is disallowed or conceded. Chiechi v. Commissioner, supra. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v. Commissioner, 893 F.2d 225, 228 (9th Cir. 1990), affg. T.C. Memo. 1988-416; Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part and remanding T.C. Memo. 1988-211; Harness v. Commissioner, supra.

No argument was made and no evidence was presented to the Court in the present cases to prove that disallowance and concession of the tax benefits related to anything other than a

valuation overstatement.  To the contrary, petitioners each stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177.  In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers.  The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance.  Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transaction in these cases was a sham and lacked economic substance.

Consistent with our findings in Provizer, petitioners each stipulated that the Empire partnership had no net equity value, that Empire's sole activity lacked any potential for profit, and that the Empire transaction therefore lacked economic substance. When a transaction lacks economic substance, section 6659 will apply because the correct basis is zero and any basis claimed in excess of that is a valuation overstatement.  Gilman v. Commissioner, supra; Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

We held in <u>Provizer v. Commissioner</u>, <u>supra</u>, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the <u>Provizer</u> case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our finding of a lack of economic substance. Petitioners conceded that the Empire transaction was similar to the Clearwater transaction described in <u>Provizer v. Commissioner</u>, <u>supra</u>, and that the Empire transaction lacked economic substance. Given those concessions, and the fact that the records here plainly show that the overvaluation of the recyclers was the reason for the disallowance of the tax benefits, and the fact that no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the tax benefits related to anything other than a valuation overstatement, we conclude that the deficiencies caused by the disallowance of the claimed tax benefits were attributable to the overvaluation of the Sentinel EPE recyclers.

Finally, we consider petitioners' express argument as to waiver of the penalty. On brief, petitioners each contested imposition of the section 6659 addition to tax on the grounds that respondent erroneously failed to waive the addition to tax. Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatements if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims

were made in good faith.  Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.  Krause v. Commissioner, 99 T.C. at 179.

Petitioners urge that they relied on Gallagher and the offering materials in deciding on the valuation claimed on their tax return.  Petitioners each contend that such reliance was reasonable, and, therefore, respondent should have waived the section 6659 addition to tax.  Petitioners rely upon Krause v. Commissioner, supra; Rousseau v. United States, 91-1 USTC par. 50252 (E.D. La. 1991); and Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23, in support of their argument.

We have found that petitioners' purported reliance on Gallagher, and the offering materials was not reasonable. Gallagher was a representative of Bankers Trust.  He was not an engineer and he never represented himself as being an expert in plastics or plastics recycling.  In Gallagher's view, Bankers Trust's due diligence responsibility, and therefore Gallagher's own responsibility, was limited to reviewing the tax opinion letter included in the offering memorandum.  The evaluators whose reports were attached to the offering memorandum each owned interests in partnerships that leased Sentinel EPE recyclers. The offering memorandum contained numerous caveats, including the following:  NO OFFEREE SHOULD CONSIDER THE CONTENTS OF THIS MEMORANDUM *** AS *** EXPERT ADVICE.  *** EACH OFFEREE SHOULD

CONSULT HIS OWN PROFESSIONAL ADVISERS.  Petitioners were experienced in pricing machinery, yet they did not make the effort personally to see a Sentinel EPE recycler or independently investigate the machinery prior to investing in Empire.

Petitioners' reliance on Krause v. Commissioner, supra, Rousseau v. United States, supra, and Mauerman v. Commissioner, supra, in support of their contention that they acted reasonably, is misplaced.  In the Krause and Rousseau cases, the section 6659 addition to tax was disallowed in light of the respective holdings that the taxpayers in each case had a reasonable basis for the valuations claimed on the tax returns or had reasonable cause for the understatement on the return and were not subject to negligence additions to tax.  In contrast, we have held that petitioners herein did not act reasonably in claiming deductions and investment tax credits related to Empire, that the errors on petitioners' tax returns were caused by the excessive valuations of the underlying machinery in the Empire transaction, that petitioners lacked reasonable cause for such overvaluation, and that each petitioner is therefore liable for the negligence additions to tax under section 6653(a).  See supra pp. 14-28. Accordingly, petitioners' reliance on the Krause and Rousseau cases is misplaced.

In Mauerman v. Commissioner, supra, the Tenth Circuit Court of Appeals held that the Commissioner had abused her discretion by failing to waive a section 6661 addition to tax.  Like section

6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith. Sec. 6661(c). The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized. The advice relied upon by the taxpayer in Mauerman was within the scope of his advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. Particularly with respect to valuation, petitioners in these cases relied upon advice that was outside the scope of expertise and experience of their advisers. Consequently, we consider petitioners' reliance on the Mauerman case inapplicable.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in Empire. In these cases, respondent properly could find that petitioners' respective reliance on Gallagher and the offering materials was unreasonable. The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position. We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion. Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the

underpayments of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.